IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SALVATORE SPARACIO | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, Acting | : | NO.  21-3640 |
| Commissioner of Social Security[1] | : | |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                          September 30, 2022

Salvatore Sparacio ("Plaintiff") seeks review of the Commissioner's decision

denying his application for disability insurance benefits ("DIB").  For the reasons that

follow, I conclude that the decision of the Administrative Law Judge ("ALJ") is

supported by substantial evidence.

**I.      PROCEDURAL HISTORY**

Plaintiff protectively filed for DIB on June 7, 2019, alleging disability beginning

on March 20, 2019, as a result of osteoarthritis, back pain, and knee pain.  Tr. at 84, 168,

357, 360.[2]  Plaintiff's application was denied initially, id. at 93, and on reconsideration.

---

[1]Kilolo Kijakazi is currently the Acting Commissioner of Social Security, see
https://www.ssa.gov/agency/commissioner/ (last visited Sept. 14, 2022), and should be
substituted for Andrew Saul as the defendant in this action.  Fed. R. Civ. P. 25(d).  No
further action need be taken to continue this suit by reason of the last sentence of section
205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2]To be entitled to DIB, Plaintiff must establish that he became disabled on or
before his date last insured.  20 C.F.R. § 404.131(b).  Social Security Administration
documents indicate that Plaintiff's date last insured is December 31, 2023, see tr. at 84,
94, 357, 383, 385, while the ALJ stated that Plaintiff has required sufficient quarters of
coverage to remain insured through December 31, 2024.  Id. at 23.  As both dates are in
the future, I do not find it necessary to resolve the apparent discrepancy at this time.

Id. at 104.  Plaintiff requested a hearing before an ALJ, id. at 116-17, which took place on August 5, 2020.  Id. at 35-83.[3]  On November 18, 2020, the ALJ issued a decision concluding that Plaintiff was not disabled.  Id. at 23-30.  The Appeals Council denied Plaintiff's request for review on June 16, 2021, id. at 1-4, making the ALJ's November 18, 2020 decision the final decision of the Commissioner.  20 C.F.R. § 404.981.

Plaintiff commenced this action in federal court on August 16, 2021, Doc. 1, and the matter is now fully briefed and ripe for review.  Docs. 6, 7 & 8-1.[4]

## II.   LEGAL STANDARDS

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process, evaluating:

> 1.      Whether the claimant is currently engaged in substantial gainful activity;
>
> 2.      If not, whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities;
>
> 3.      If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt.

---

[3]The hearing was conducted telephonically due to the COVID-19 coronavirus pandemic.  Tr. at 23, 37.

[4]The parties consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  See Standing Order, In RE:  Direct Assignment of Social Security Appeal Cases to Magistrate Judges (Pilot Program) (E.D. Pa. Sept. 4, 2018); Doc. 4.

404, subpt. P, app. 1, which results in a presumption of
disability;

      4.    If the impairment does not meet or equal the
criteria for a listed impairment, whether, despite the severe
impairment, the claimant has the residual functional capacity
("RFC") to perform his past work; and

      5.    If the claimant cannot perform his past work,
then the final step is to determine whether there is other work
in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R.

§ 404.1520(a)(4).  The claimant bears the burden of proof at steps one through four,

while the burden shifts to the Commissioner at the fifth step to establish that the claimant

is capable of performing other jobs in the local and national economies, in light of his

age, education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d

88, 92 (3d Cir. 2007).

      The court's role on judicial review is to determine whether the Commissioner's

decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r

of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is

whether substantial evidence supports the Commissioner's conclusion that Plaintiff is not

disabled.  Substantial evidence is "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion," and must be "more than a mere scintilla."

Zirnsak, 777 F.2d at 610 (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir.

2005)); see also Biestek v. Berryhill, __ U.S. __, 139 S. Ct. 1148, 1154 (2019)

(substantial evidence "means only – 'such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion'") (quoting Consol. Edison Co. v. NLRB, 305

U.S. 197, 229 (1938)).  The court has plenary review of legal issues.  <u>Schaudeck</u>, 181

F.3d at 431.

## III.   <u>DISCUSSION</u>

The ALJ found that Plaintiff had severe impairments of bilateral knee

osteoarthritis, lumbar degenerative disc disease ("DDD"), and obesity, as well as non-

severe hypertension, and that his impairments did not meet or equal any of the Listings.

<u>Tr.</u> at 25-26.  The ALJ further found that Plaintiff retained the RFC to perform light

work, except that he can occasionally climb and crawl, frequently stoop, crouch, kneel,

and balance, and occasionally be exposed to wetness and extreme cold.  <u>Id.</u> at 27.  Based

on this RFC assessment and the testimony of a vocational expert ("VE"), the ALJ

concluded that Plaintiff could perform his past relevant work as a restaurant manager as

the job is generally performed.  <u>Id.</u> at 29-30.

### A.   <u>Summary of the Record</u>

Plaintiff was born on May 21, 1965, making him 54 years old at the time of his

application (June 7, 2019), and 55 at the time of the ALJ's decision (November 18,

2020).  <u>Tr.</u> at 84, 357.  He is five feet and ten inches tall and weighs between

approximately 220 and 233 pounds.  <u>Id.</u> at 360, 421, 427, 435, 505, 515, 528.  He resides

in a two-story house with his wife and two adult children.  <u>Id.</u> at 40-41.  Plaintiff stated in

his June 25, 2019 Disability Report that he completed the tenth grade and in 2017

received a certificate in food service management.  <u>Id.</u> at 361.[5]  He worked as a restaurant

---

[5]In contrast, Plaintiff testified at the hearing that he completed the eleventh grade
and has no specialized training, <u>tr.</u> at 42-43, and explained that the certificate mentioned

manager from January 1989 until his alleged disability began in March 2019.  Id.  at 55, 60, 361.[6]

1.    Medical Treatment Record

The record establishes that Plaintiff has a history of complaints of lower back and bilateral knee pain.  On March 20, 2019 -- Plaintiff's alleged onset date -- Plaintiff visited Ann Tenthoff, M.D., with complaints of knee pain.  Tr. at 427.[7]  Plaintiff reported that he owned a pizzeria and was "constantly on his feet and using his arms" and that he had experienced worsening pain and fatigue over the past week.  Id.  Musculoskeletal examination revealed no swelling or deformity and full range of motion with tenderness in the lateral epicondyle.  Id.[8]  Dr. Tenthoff assessed Plaintiff with arthralgia, unspecified joint, and elevated blood pressure.  Id.

In a follow-up with Dr. Tenthoff on April 3, 2019, Plaintiff continued to report fatigue and widespread joint pain, especially in both knees and elbows.  Tr. at 425.  Dr. Tenthoff noted that previous lab work did not show significant abnormalities to explain

---

in the Disability Report was a certification related to health inspections of the restaurant he owns and not to any specialized training.  Id. at 47-48.

[6]At the hearing, Plaintiff explained that earnings of $7,624 for the period April-June 2019 was for accumulated vacation pay and not earnings from work after his alleged onset date.  Tr. at 43.

[7]Records which appear more than once in the administrative record will be cited to one location, preferably to where they appear independent of another provider's records.

[8]An epicondyle is an eminence of bone above its condyle, or rounded end. Dorland's Illustrated Medication Dictionary, 32nd ed. 2012 ("DIMD"), at 402, 630.  Dr. Tenthoff's record does not identify which epicondyle was affected, but in context it is likely the lateral epicondyle of the knee.

Plaintiff's symptoms, and started him on Prednisone.  Id.[9]  Following another visit on

May 6, Dr. Tenthoff assessed Plaintiff with hypertension for which he prescribed

lisinopril, acute bilateral low back pain without sciatica, and bilateral knee pain, referred

him to physical therapy ("PT"), and ordered imagining of his lower back and knees.  Id.

at 423.[10]

On May 7, 2019, x-rays of Plaintiff's knees showed mild osteoarthritis, with no

evidence of fracture and dislocation and "mild loss of joint space in the medial

compartment."  Tr. at 417-18, 431-32.  On the same day, imaging of Plaintiff's back

showed mild lumbar spondylosis, grade 1 retrolisthesis of L4 on L5, and mild

dextroscoliosis.  Id. at 419, 433.[11]  On May 30, 2019, Dr. Tenthoff diagnosed Plaintiff

with osteoarthritis of multiple joints and started him on Meloxicam.  Id. at 421.[12]

---

[9]Prednisone is a corticosteroid used as an anti-inflammatory or an immunosuppressant medication to treat allergic disorders, skin conditions, ulcerative colitis, arthritis, lupus, psoriasis, or breathing disorders.  See http://www.drugs.com/prednisone.html (last visited Sept. 22, 2022).

[10]Lisinopril is an ACE inhibitor used to treat high blood pressure, congestive heart failure, and to improve survival after a heart attack.  See http://www.drugs.com/lisinopril.html (last visited Sept. 29, 2022).

[11]Spondylosis is defined as degenerative spinal changes due to osteoarthritis. DIMD at 1754.  Retrolisthesis (also known as retrospondylolisthesis) is the posterior displacement of one vertebral body over another.  Id. at 1636.  Dextroscoliosis is an appreciable right-lateral deviation of the spine.  Id. at 505, 1681.

[12]Meloxicam (brand name Mobic) is a nonsteroidal anti-inflammatory drug ("NSAID") used to treat pain or inflammation caused by rheumatoid arthritis and osteoarthritis.  See https://www.drugs.com/meloxicam (last visited Sept. 22, 2022).

Meanwhile, on May 16, 2019, Plaintiff was assessed and treated by physical therapist Amanda Stillman of NovaCare Rehabilitation ("NovaCare"). Tr. at 488-94. Plaintiff reported increased pain in his lower back and bilateral knees, which increases with activity and is moderately limiting. Id. at 488. Plaintiff exhibited some limitations in his spine range of motion and "tolerated treatment intervention with mild complaints of pain." Id. at 488, 490. Plaintiff's course of PT included aerobic exercise, stretching, and electric stimulation. Id. at 491, 494. Ms. Stillman assessed Plaintiff's rehabilitative potential as "fair." Id. at 490. Plaintiff attended PT three more times between May 23 and July 9, 2019. Id. at 495-504.

On May 31, 2019, Plaintiff began treating with Mehul Bipin Amin, M.D., of the Amin Medical Center. Tr. at 434. Plaintiff described his low back and bilateral knee pain as "chronic and progressive," rated the pain as 8/10, and reported that three weeks of PT did not provide relief. Id. Upon physical examination, Plaintiff exhibited bilateral knee pain on range of motion and lumbar muscle tightness/tenderness. Id. at 435. Dr. Amin advised Plaintiff to begin a stretching routine, referred him to PT for a functional assessment, and prescribed Celebrex. Id. at 435-36.[13]

On June 13, 2019, on referral from Dr. Amin, Plaintiff was evaluated by physical therapist Boben Babu at Parry Physical Therapy Group. Tr. at 472-74. Plaintiff described his low back pain as located in the center of his back, and his bilateral knee

---

[13]Celebrex (generic celecoxib) is an NSAID used to treat pain or inflammation caused by many conditions such as arthritis. See https://www.drugs.com/celebrex (last visited Sept. 22, 2022).

pain as located in the front of his knees.  Id. at 472.  He reported that sitting or shifting positions helps his back pain, and that nothing helps his knee pain.  Id.  Objectively, Plaintiff's movements were guarded with position changes and general mobility, his toe/heel walking was unremarkable, and he exhibited a moderate antalgic gait with stiffness and reduced trunk rotation.  Id. at 472-73.   Mr. Babu opined that Plaintiff's symptoms could be "successfully resolved through a formal PT program with home exercises," and that his prognosis was "good" with compliance.  Id. at 474.  The physical therapist noted that the subjective and objective findings regarding Plaintiff's knees were inconsistent with his physical presentation, that he was negative for all special tests assessing structural compromise in his knee, and that his mild osteoarthritis was not consistent with his complaints of knee pain.  Id.  Mr. Babu further noted that special tests were inconclusive as to Plaintiff's lumbar spine as Plaintiff reported pain in all planes of motion without a clinical pattern.  Id.

On July 9, 2019, Plaintiff was discharged from PT at NovaCare, despite complaints of increased pain and moderate limitations.  Tr. at 502.  At discharge, the physical therapist continued to assess Plaintiff's rehabilitative prognosis as "fair."  Id. at 503.

On August 21, 2019, treating physician Anthony Colavita, M.D., documented Plaintiff's complaints of ongoing lower back and knee pain.  Tr. at 509.  Dr. Colavita referred Plaintiff to Marc Zimmerman, M.D., for a disability evaluation.  Id.

On August 30, 2019, Dr. Zimmerman examined Plaintiff.  Tr. at 505-06.  Plaintiff reported low back and bilateral knee pain, worse with activity, that he did not experience

radicular pain, numbness or tingling, and that he had occasional popping in his knees.  Id.
at 505.  His medications were lisinopril for hypertension and Celebrex for osteoarthritis.
Id.  Upon examination of his lumbosacral spine, Plaintiff exhibited tenderness in the right
sacroiliac notch region, limited range of motion with some pain on extreme range of
motion, negative straight leg raise ("SLR") and sitting root tests, [14] and no muscle
atrophy.  Id.  Plaintiff's knees exhibited no swelling, redness, or effusion and full range
of motion, with pain on extreme range of motion, an occasional pop, and mild pain on
patellar inhibition.  Id.  Plaintiff reported no significant symptom improvement with PT
or Celebrex.  Id. at 506.  Dr. Zimmerman directed Plaintiff to rest and apply ice, changed
his medication from Celebrex to Naprosyn, and injected both knees to alleviate knee
pain.  Id.

On September 19, 2019, as part of the initial disability determination, Minda
Bermudez, M.D., performed a medical record review and assessed Plaintiff's RFC.  Tr. at
85-92.  Dr. Bermudez opined that Plaintiff could lift/carry up to twenty pounds
occasionally and ten pounds frequently, and that in an eight-hour workday he could sit
for six hours and stand/walk for a total of four hours, occasionally perform postural
activities, and avoid concentrated exposure to extreme cold, wetness, and vibration.  Id. at

---

[14]The SLR is performed to determine whether a patient with low back pain has an
underlying herniated disc, requires the patient to be in a supine position and to lift his or
her leg, and is positive if pain is produced between 30 and 70 degrees.  Johnson v.
Colvin, Civ. No. 09-2228, 2014 WL 7408699, at *5 n.17 (M.D. Pa. Dec. 30, 2014)
(citation omitted).  The sitting root test (also known as the sitting SLT) is a variation that
requires the patient to be sitting when the legs are raised.  Id.; see also See
https://www.ebmconsult.com/articles/straight-leg-raising-test (last visited Sept. 22,
2022).

89-90.  The doctor concluded that Plaintiff lacked the RFC to return to his prior work as a restaurant manager, but that he could perform sedentary work and was therefore not disabled.  Id. at 91-92.  On March 10, 2020, Chankun Chung, M.D., performed a medical record review and assessed Plaintiff's RFC at the reconsideration level of review, reaching the same conclusions as Dr. Bermudez.  Id. at 95-102.

On May 30, 2020, an MRI of Plaintiff's lumbar spine showed mild degenerative changes, most notable at L4-L5.  Tr. at 534.  At that level, the MRI showed a small disk bulge and small central disk protrusion, moderate facet arthropathy, a left foraminal disk protrusion with annular fissure, mild bilateral neural foraminal narrowing, and no central canal narrowing.  Id.  The MRI showed no severe stenosis and mild scoliosis.  Id. at 527.

On June 5, 2020, Plaintiff was examined by Zachary Hauser, M.D., of Premier Sports and Spine Rehabilitation.  Tr. at 527-28.  Dr. Hauser noted Plaintiff's chief complaint as chronic low back pain radiating in the lower extremities, worse with bending, sitting, standing, walking, and carrying heavy objects, and bilateral knee arthritis.  Id. at 527.  Upon examination, Plaintiff appeared healthy and was not in acute distress and he could walk without assistance and exhibited normal gait.  Id.  His lumbar flexion was 50% normal with moderate pain, extension and side bending full with mild pain, and extension with rotation bilaterally with mild pain.  Id.  Examination of Plaintiff's knees revealed no obvious effusion, he could heel and toe walk, had grossly normal leg strength, and increased pain when squatting.  Id.  Dr. Hauser's impressions were chronic low back pain with radiculopathy, grade 1 spondylolisthesis at L4-5 with central disk protrusion and left foraminal protrusion with annular fissuring, and bilateral

knee arthritis.  Id.  The doctor stated that Plaintiff had exhausted conservative treatment, did not want lumbar fusion surgery, and that there was no indication for acute surgical intervention.  Id.  Dr. Hauser scheduled an epidural injection for Plaintiff's back pain and continued him on anti-inflammatory medication.  Id.

On June 10, 2020, Plaintiff visited Kevin Dabundo, D.O., his primary treatment provider.  Tr. at 513-16.  Plaintiff complained of ongoing back and knee pain, stating that he could stand for only ten -to- fifteen minutes, and walk and sit for fifteen minutes each. Id. at 513.  Plaintiff reported that Celebrex reduces his back and bilateral knee pain from 7/10 to 5/10.  Id. at 513.  Upon examination, Plaintiff exhibited some tenderness over his right lower paraspinal musculature and minor tenderness over his lumbar spine, and full range of motion of the lumbar spine despite pain with all motion except side-bending.  Id. at 516.  Plaintiff's knees had no swelling or effusion bilaterally, with tenderness to palpation over the medial and lateral joint line, and full range of motion with pain at the end of the range.  Id.  On the same date, Dr. Hauser performed a lumbar injection to treat Plaintiff's complaints of back pain.  Id. at 526.

On June 11, 2020, Dr. Dabundo completed an RFC Form.  Tr. at 518-22.  The doctor described Plaintiff's symptoms consistent with the limitations and pain ratings reported by Plaintiff the previous day, including that his back and knee pain worsens after standing and walking more than fifteen minutes and that he must change positions frequently.  Id. at 518.  Dr. Dabundo listed Plaintiff's diagnoses as lumbar disc disease and bilateral knee pain.  Id.  The doctor opined that Plaintiff could occasionally lift and carry up to ten pounds, and in an eight-hour workday could sit for fifteen -to- thirty

11

minutes at a time and for up to six hours total, stand for fifteen minutes at a time and for one -to- two hours total, and walk with the same limitations as standing.  Id. at 519-20. Dr. Dabundo further opined that Plaintiff could never climb stairs/ramps, balance, stoop, kneel, crouch, or crawl, was limited in turning/rotating at the waist due to lumbar back pain, and could only occasionally tolerate heat.  Id. at 521.  The doctor identified Plaintiff's pain as the basis of the limitations, and that Plaintiff was "credible."  Id. at 522-23.  Dr. Dabundo opined that Plaintiff's prognosis was fair, noting that multiple treatments for low back and knee pain had not yet been tried, and that Plaintiff could return to restaurant work within six -to- twelve months if such treatment was successful. Id. at 519, 523.

        2.    Testimony

At the administrative hearing, Plaintiff explained that he has not worked since March 19, 2019, when he attempted to get down at work and felt worse pain.  Tr. at 55. His wife and children run a family restaurant, but he no longer participates in the day-to-day operation of the business after 30 years of "hands-on" work in the kitchen, which included carrying food, bending down, reaching into bags, and putting food away.  Id. at 44-45, 50.[15]  He has never used a computer or gone on the Internet.  Id. at 63.

---

[15]Plaintiff remains president of the corporate entity which does business as Riviera, which is the name of the restaurant and pizzeria owned by Plaintiff and his wife. See tr. at 43-45.  When asked if he pays the bills, mortgage, and utilities related to the business, Plaintiff responded, "My wife take[s] care of all that."  Id. at 50.  Plaintiff's wife participated in the telephonic hearing and answered questions related to the structure and finances of the family business.

Plaintiff testified that he tries to limit the number of times he goes up the stairs daily. <u>Tr.</u> at 41. He has a driver's license and can drive locally, within five -to- ten minutes. <u>Id.</u> at 42. Injections in his back and knees provide "a little bit" of relief from pain, but the pain returns when the injections wear off. <u>Id.</u> at 52, 76. Similarly, both rounds of PT provided only short-term relief from pain, <u>id.</u> at 74, and pain medication makes the pain "a little bit more bearable" during the day but does not eliminate it completely, and it causes dizziness and nausea. <u>Id.</u> at 52, 77-78. Plaintiff testified that the pain has been getting worse over time. <u>Id.</u> at 73.

A VE also testified at the hearing. <u>Tr.</u> at 56-72. The VE testified that Plaintiff's past relevant work as a restaurant manager would be classified and performed as light work, although the extertional level of such jobs "could exceed the classification," <u>id.</u> at 57, and the tasks Plaintiff talked about are "really more medium." <u>Id.</u> at 71. The ALJ first asked the VE to assume a hypothetical individual of Plaintiff's age, education, and past work experience who could perform a range of medium work, with occasional climbing and crawling, frequent stooping, crouching, kneeling, and balancing, and occasional exposure to wetness and extreme cold. <u>Id.</u> at 69-70. The VE testified that such an individual could perform Plaintiff's past relevant work as it is generally performed in the national economy, as well as other jobs in the national economy such as sorter, bagger, and laundry worker. <u>Id.</u> at 70. When presented with the same hypothetical but a limitation to light work, the VE testified that such a person could still perform Plaintiff's past relevant work as it is classified, although not as performed. <u>Id.</u> at 70-71.

13

### B.    <u>**Plaintiff's Claims**</u>

Plaintiff claims that (1) the ALJ rejected the opinions of a treating physician and two state agency consultants for erroneous reasons, and (2) the government deprived Plaintiff of a valid administrative adjudicatory process because the Commissioner under whom the ALJ issued the final decision served a longer term than constitutionally permissible, violating the separation of powers. Docs. 6 & 8-1. Defendant responds that the ALJ's decision is supported by substantial evidence and the separation of powers/improper delegation argument does not entitle Plaintiff to a remand. Doc. 7.

#### 1.    <u>Opinion Evidence</u>

In his sole claim related to the ALJ's consideration of the evidence, Plaintiff argues that the ALJ erroneously evaluated the opinions of a treating physician and two state agency consultants, and impermissibly substituted her opinion for that of the medical experts. Doc. 6 at 3-8; Doc. 8-1 at 1-2. Defendant counters that Plaintiff relies on outdated regulations and case law, and that the ALJ's evaluation of the medical opinion evidence is supported by substantial evidence. Doc. 7 at 4-12.

Defendant is correct that Plaintiff relies on outdated regulations in his initial brief, citing language from regulations and case law that required the Commissioner to accord more "weight" to the opinions of treating physicians. Doc. 6 at 6. Instead, the new regulations governing the consideration of opinion evidence, which apply to Plaintiff's claim because it was filed after March 27, 2017, focus on the persuasiveness of each medical opinion.

> We will not defer or give any specific evidentiary weight,
> including controlling weight, to any medical opinion(s) or
> prior administrative medical finding(s), including those from
> your medical sources.

20 C.F.R. § 404.1520c(a).[16]  The regulations list the factors to be utilized in considering

medical opinions:  supportability, consistency, treatment relationship including the length

and purpose of the treatment and frequency of examinations, specialization, and other

factors including familiarity with other evidence in the record or an understanding of the

disability program.  Id. § 404.1520c(c).  The most important of these factors are

supportability and consistency, and the regulations require the ALJ to explain these

factors, but do not require discussion of the others.  Id. § 404.1520c(b)(2).  The

regulations explain that "[t]he more relevant the objective medical evidence and

supporting explanations presented by a medical source are to support his or her medical

opinion(s) . . . , the more persuasive the medical opinions . . . will be."  Id.

§ 404.1520c(c)(1).  In addition, "[t]he more consistent a medical opinion(s) . . .  is with

the evidence from other medical sources and nonmedical sources . . . , the more

persuasive the medical opinion(s) . . . will be."  Id. § 404.1520c(c)(2).  Plaintiff does not

address the governing regulation in his reply brief.  Doc. 8-1 at 1-2.

The change in the regulations did not change the basic rule that "[t]he ALJ must

consider all the evidence and give some reason for discounting the evidence she rejects."

Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (citing Stewart v. Sec'y HEW, 714

---

[16]The regulations governing prior applications spoke in terms of the weight to be given each opinion, including controlling weight for the opinions of certain treating sources.  20 C.F.R. § 404.1527.

F.2d 287, 290 (3d Cir. 1983)).  When there is a conflict in the evidence, the ALJ may

choose which evidence to credit and which evidence not to credit, so long as she does not

"reject evidence for no reason or for the wrong reason."  Rutherford v. Barnhart, 399

F.3d 546, 554 (3d Cir. 2005); see also Plummer, 186 F.3d at 429 (quoting Mason v.

Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)).

Here, the ALJ assessed the medical opinion evidence as follows:

> At the initial level, state agency consultant Minda Bermudez,
> M.D. opined that [Plaintiff] could perform a range of work at
> the light exertional level except that he could only stand
> and/or walk for a total of four hours.  She opined that
> [Plaintiff] could only occasionally perform the postural
> activities and must avoid concentrated exposure to extreme
> cold, wetness, and vibration.  These findings were affirmed
> on reconsideration by state agency consultant Chankun
> Chung, M.D.  These opinions are somewhat persuasive, as the
> overall evidence of record supports a limitation to a range of
> work at the light exertional level. . . .  However, the
> limitations in standing and walking and the limitation
> regarding work around vibrations are not supported by the
> minimal objective findings and [Plaintiff's] objective physical
> presentation.  His physical therapist noted that [Plaintiff's]
> subjective complaints were inconsistent with his physical
> presentation.  At an appointment in June 2020, [Plaintiff] was
> able to walk without any assistance with a normal gait
> pattern.  Accordingly, the undersigned finds these opinions to
> be only somewhat persuasive.
>
> Kevin Dabundo, D.O. submitted a[n RFC] assessment in
> which he opined that [Plaintiff] could perform less than the
> full range of sedentary exertion work except that he could
> only sit for 15 to 30 minutes without interruption and could
> only stand and walk for 15 minutes at a time and one to two
> hours total in an eight hour workday.  He opined that
> [Plaintiff] could never perform the postural activities, was
> limited in turning, and had additional environmental
> limitations.  He opined that [Plaintiff] could not continue or
> resume work at his previous employment.  This opinion is not

persuasive.  It is inconsistent with the objective imaging results, which reveal only mild findings, and with Dr. Dabundo's own treatment records, which indicate only mild tenderness and full range of motion, though with some pain. Neither the objective findings nor [Plaintiff's] course of treatment warrant the significant limitations assessed by Dr. Dabundo and the undersigned therefore does not find this opinion to be persuasive.

Tr. at 29 (citations to record omitted).

Plaintiff argues that this aspect of the ALJ's opinion is not supported by substantial evidence because the ALJ failed to give deference to Plaintiff's treating physician and substituted her lay opinion for those of the medical opinions in assessing Plaintiff's RFC.  I disagree.

First, as previously noted, the applicable regulations do not require the ALJ to give greater deference or weight to the RFC assessment made by Dr. Dabundo simply because he is a treating physician, but rather the ALJ must consider the factors set forth in the regulations and explain the extent to which the medical opinions are supported by, and are consistent with, the record.  20 C.F.R. § 404.1520c(b)(2).  That is precisely what the ALJ did here.  For example, the ALJ found Dr. Dabundo's assessment unpersuasive because the limitations expressed in his RFC assessment were inconsistent with the objective imaging results showing mild findings, and with Dr. Dabundo's own treatment records.  As previously summarized, those treatment notes consist of one visit conducted the day before Dr. Dabundo's RFC assessment, in which the doctor memorialized Plaintiff's subjective reports of pain, including that medication reduced his pain from 7/10 to 5/10, and examination findings of minor tenderness over Plaintiff's lumbar spine,

17

full range of motion of the lumbar spine despite pain with all motion except side-bending, no swelling or effusion of his knees bilaterally, and full range of motion with pain at the end of the range.  Id. at 516.  These findings do not support the more extreme limitations found by Dr. Dabundo, but are consistent with the findings made by other medical examiners as summarized by the ALJ.  For example, Dr. Zimmerman noted that Plaintiff did not experience radicular pain, numbness, or tingling, exhibited negative SLR testing and no muscle atrophy, had limited range of motion of the lumbar spine with pain on extreme range of motion, and no swelling, redness, or effusion of his knees, and full range of motion with pain only at the extreme range.  Id. at 505-06.  Similarly, Dr. Hauser noted that Plaintiff appeared healthy and was not in acute distress, could walk without assistance and exhibited normal gait, exhibited lumbar flexion to 50% normal with moderate pain, extension and side bending full with mild pain, extension with rotation bilaterally with mild pain, no obvious effusion in his knees and grossly normal leg strength, with increased pain when squatting.  Id. at 527.  Plaintiff also tolerated PT with "minimal complaints of pain."  Id. at 503.

Second, the ALJ's finding that Plaintiff could perform his past relevant work at the light exertional level does not constitute an impermissible substitution of her lay opinion for that of state agency consultants Drs. Bermudez and Chung simply because those consultants limited Plaintiff to sedentary work.  Plaintiff's argument to the contrary, see Doc. 8-1 at 2, has its genesis in Doak v. Heckler, 790 F.2d 26, 29 (3d Cir. 1986).  In Doak, the Third Circuit held that the ALJ's decision that the plaintiff was able to perform light work was not supported by substantial evidence because "[n]o physician suggested

18

that the activity Doak could perform was consistent with the definition of light work." Id. at 29.  Some courts have interpreted Doak to require the ALJ to base his or her RFC determination on an opinion from a medical source.  See, e.g., Phillips v. Berryhill, Civ. No. 15-5024, 2017 WL 2224931, at *4 (E.D. Pa. May 22, 2017).  However, cases from the Third Circuit interpreting Doak indicate that this reading is too narrow.  For example, in Chandler v. Commissioner of Social Security, the Third Circuit held that "the ALJ is not precluded from reaching RFC determinations without outside medical review of each fact incorporated into the decision."  667 F.3d 356, 362 (3d Cir. 2011).  The Third Circuit has noted that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC.  Surveying the medical evidence to craft an RFC is part of the ALJ's duties."  Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); see also Cleinow v. Berryhill, 311 F. Supp.3d 683, 685 (E.D. Pa. 2018) ("[A]n ALJ is not restricted to adopting the conclusions of a medical opinion in making an RFC determination.") (citations omitted); Callahan v. Colvin, Civ. No. 13-1634, 2014 WL 7408700, at *1 n.1 (W.D. Pa. Dec. 30, 2014) ("The Third Circuit did nothing more [in Doak] than make a substantial evidence finding in light of a limited record and did not purport to create a rule that an RFC determination must be based on a specific medical opinion.")).  Moreover, these decisions are consistent with the regulations, which provide that the RFC assessment is not a medical finding, but rather is a legal finding reserved to the Commissioner.  See 20 C.F.R. § 404.1527(d)(1)-(2).

　　Here, the ALJ explained that she found the state agency consultants to be "somewhat persuasive," explaining that their findings regarding Plaintiff's

standing/walking limitations and work around vibrations were not supported by the minimal objective medical findings in the record.  Tr. at 29.  These include the mostly mild examination findings discussed above, as well as the physical therapist's observation that Plaintiff's subjective complaints were inconsistent with his physical presentation, id. at 29, 459-61, and treatment notes indicating that Plaintiff could walk without assistance and exhibited a normal gait pattern in June 2020.  Id. at 29, 527.  The ALJ's assessment of the doctors' opinions is supported by substantial evidence.

Plaintiff states that Drs. Bermudez and Chung considered the combined impact of Plaintiff's obesity and musculoskeletal impairments in their RFC assessments, implying that the ALJ failed to do so.  Doc. 6 at 4.  However, the ALJ explicitly stated that she considered Plaintiff's obesity at each step of the sequential evaluation, "[i]n particular" the effects of obesity on Plaintiff's weight-bearing joints.  Tr. at 26.  Notably, Plaintiff did not identify obesity as a disabling condition in his application, medical providers including physical therapists did not mention complications caused by his obesity, and there is no medical opinion evidence attributing any limitations to Plaintiff's obesity.  For example, treating physician Dr. Dabundo repeatedly cited only Plaintiff's low back and bilateral knee pain as the bases for the limitations in his RFC assessment, id. at 518-23, and the doctor wrote "No" beneath the question, "Are there any other factors not addressed . . . that you believe may affect the patient's ability to work, or function normally in daily life?"  Id. at 521.

Finally, Plaintiff suggests that the ALJ should have ordered a consultative examination to supplement the record.  Doc. 6 at 7.  The decision whether to order a

consultative examination is discretionary, and an ALJ "may" order such an examination "to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim." 20 C.F.R. § 404.1519a(b).  Because the ALJ was able to make a determination on the basis of the record before her, as explained in her decision, there was no need for a consultative examiner in this case.

For all the above reasons, I find that this aspect of the ALJ's opinion is supported by substantial evidence.

2.      Challenge to the Appointment of the Commissioner of Social Security

Relying on Seila Law LLC v. Consumer Financial Protection Bureau, 140 S.Ct. 2183 (2020), Plaintiff argues that the unconstitutional structure of the Social Security Administration deprived Plaintiff of a valid administrative adjudicatory process, as to proceedings before both the ALJ and the Appeals Council.  Doc. 6 at 8-10; Doc. 8-1 at 3-28.  Although Defendant agrees that the statute governing the appointment of the Commissioner of Social Security violates the separation of powers, she maintains that this does not support setting aside the decision of the ALJ in this case.  Doc. 7 at 13-24.

In Seila Law, the Supreme Court examined the authority of the Director of the Consumer Financial Protection Bureau ("CFPB") in the context of Article II of the Constitution vesting executive power in the President.  140 S. Ct. at 2197.  The Court held that "the CFPB's leadership by a single individual removable only for inefficiency, neglect, or malfeasance violates the separation of powers."  Id.  The Court described the

structure of the CFPB as "an independent agency led by a single Director and vested with

significant executive power," and concluded that the lack of presidential authority to

remove such an officer at will had "no basis in history and no place in our constitutional

structure." Id. at 2201.

The Court compared the CFPB to other agencies, including the Social Security

Administration, and found important differences.

> After years of litigating the agency's constitutionality,
> the Courts of Appeals, parties, and *amici* have identified
> "only a handful of isolated" incidents in which Congress has
> provided good-cause tenure to principal officers who wield
> power alone rather than as members of a board or
> commission. "[T]hese few scattered examples" – four to be
> exact – shed little light . . . .
> . . . .
> Third, the CFBP's defenders note that the Social
> Security Administration (SSA) has been run by a single
> Administrator since 1994. That example, too, is
> comparatively recent and controversial. President Clinton
> questioned the constitutionality of the SSA's new single-
> Director structure upon signing it into law. In addition,
> unlike the CFPB, the SSA lacks the authority to bring
> enforcement actions against private parties. Its role is largely
> limited to adjudicating claims for Social Security benefits.
> . . . .
> . . . [T]hese isolated examples are modern and
> contested. And they do not involve regulatory or
> enforcement authority remotely comparable to that exercised
> by the CFPB. The CFPB's single-Director structure is an
> innovation with no foothold in history or tradition.

Id. at 2202 (internal citations omitted). Thus, in finding a separation of powers violation

in the for-cause restriction on removal of the Director of the CFPB, the Court

distinguished the SSA from the CFPB.

Moreover, after determining that "the CFPB's leadership by a single independent Director violates the separation of powers," the Court in <u>Seila Law</u> addressed the remedy for the constitutional violation. 140 S. Ct. at 2207-08. At issue was the enforceability of the CFPB's civil investigative demand issued to a law firm. Rather than simply dismissing the agency's enforcement action, the Court determined that "the removal provision can be severed from the other statutory provisions relating to the CFPB's powers and responsibilities," <u>id.</u> at 2209, noting that "[w]e think it clear that Congress would prefer that we use a scalpel rather than a bulldozer in curing the constitutional defect we identify today." <u>Id.</u> at 2210-11. The Court remanded the matter for a determination whether the civil investigative demand was validly ratified. <u>Id.</u> at 2211.

Here, Defendant agrees that the provision limiting the President's authority to remove the Commissioner of Social Security without good cause violates the separation of powers, Doc. 16 at 5, but here the parties' agreement ends. Plaintiff contends that because the Commissioner delegates authority to ALJ and Appeals Council to hear and decide cases pursuant to regulations promulgated by an unconstitutionally appointed Commissioner, the administrative decision is constitutionally defective. Doc. 6 at 8-10; Doc. 8-1 at 3-24. Defendant argues that the appointment of the ALJ who decided this case was ratified by an Acting Commissioner, removable at will, and that Plaintiff has not and cannot show that the removal restriction caused the denial of his claim. Doc. 7 at 13-20.[17]

---

[17]It is unclear when the ALJ in this case was appointed, and by whom. Plaintiff argues that the ALJ's authority to rule in this case emanated from prior Commissioner

My colleague, the late Honorable Marilyn Heffley, addressed Seila Law's

applicability in the Social Security appeals context.  See Wicker v. Kijakazi, Civ. No. 20-

4771, 2022 WL 267896 at *8-10 (E.D. Pa. Jan. 28, 2022).  After reviewing several such

cases from across the country, Judge Heffley observed that the district courts have relied

on another recent Supreme Court case in rejecting the separation of powers argument in

Social Security appeals.  Id. at *9 (citing Collins v. Yellen, 141 S. Ct. 1761 (2021)).

Collins involved the for-cause removal restriction for the single director of the Federal

Housing Finance Agency ("FHFA"), which the Supreme Court found violated the

separation of powers.  The Court instructed that "whenever a separation-of-powers

violation occurs, any aggrieved party *with standing* may file a constitutional challenge."

141 S. Ct. at 1780 (emphasis added).  To establish standing, "a plaintiff must show that it

has suffered 'an injury in fact' that is 'fairly traceable' to the defendant's conduct and

would likely be 'redressed by a favorable decision.'"  Id. at 1779 (quoting Lujan v.

Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).  "[F]or purposes of traceability, the

relevant inquiry is whether the plaintiffs' injury can be traced to 'allegedly unlawful

conduct' of the defendant, not to the provision of law that is challenged."  Id. (quoting

Allen v. Wright, 468 U.S. 737, 751 (1984)).[18]

---

Andrew Saul, whose appointment is allegedly unconstitutional.  Doc. 6 at 8.  Defendant
states that the ALJ's appointment was ratified by an Acting Commissioner whose
appointment did not violate the separation of powers.  Doc. 7 at 13.  I need not delve into
the ALJ's appointment in this case because Plaintiff's challenge to the authority of the
ALJ and Appeals Council is based upon the validity of the Commissioner's appointment
in light of the unconstitutional removal protection.

[18]In Seila Law, the Supreme Court "found it sufficient that the challenger
sustain[ed] injury from an executive act that allegedly exceeds the official's authority."

Judge Heffley next explained the application of <u>Collins</u> to a Social Security

benefits review case, relying on a case arising out of the Western District of Washington.

> In <u>Collins</u>, the Directors of the FHFA adopted an
> amendment . . . to certain financial agreements that
> "materially changed the nature of the agreements" and
> resulted in the companies in which plaintiffs were
> shareholders transferring to the U.S. Treasury "at least $124
> billion dollars more than the companies would have had to
> pay" under the prior form of the agreements.  The plaintiffs in
> <u>Collins</u> thus had an identifiable basis to contend that but for
> the unconstitutional removal provision, the President may
> have removed and appointed a different Director who would
> have disapproved of the adoption (or implementation) of the .
> . . [a]mendment.
>     In contrast, there is nothing showing the
> Commissioner or the SSA implemented new and relevant
> agency action that may have turned upon the President's
> inability to remove the Commissioner.  Plaintiff has not
> identified any new regulations, agency policies or directives
> Commissioner Saul installed that may have affected her
> claims.  Plaintiff thus fails to show how or why [the unlawful]
> removal clause possibly harmed her.

<u>Wicker</u>, 2022 WL 267896, at *10 (quoting <u>Lisa Y. v. Comm'r of Soc. Sec.</u>, No. C21-

5207, 2021 WL 5177363, at *7 (W.D. Wash. Nov. 8, 2021) (internal citations omitted));

<u>see also</u> <u>Kowalski v. Kijakazi</u>, Civ. No. 20-1783, 2022 WL 526094, at *10-11 (M.D. Pa.

Feb. 22, 2022) (requiring nexus between removal restriction and denial of application for

disability benefits); <u>Mor v. Kijakazi</u>, Civ. No. 21-1730, 2022 WL 73510, at *5 (D.N.J.

---

140 S.Ct. at 2196.  In <u>Collins</u>, the Supreme Court held that the traceability requirement
was satisfied because the shareholders suffered a "pocketbook injury" directly traceable
to an amendment adopted by the directors of the FHFA that "materially changed the
nature of their agreements."  141 S.Ct. at 1779.

25

Jan. 7, 2022) (same).  I concur with Judge Heffley's analysis and conclude that Plaintiff

has not established the requisite nexus.

Here, Plaintiff identifies six injuries linked to the alleged violation of his

constitutional rights; (1) an invalid ALJ hearing, (2) an invalid ALJ decision, (3) "an

unfavorable decision from this constitutionally illicit ALJ adjudication process," (4) an

invalid Appeals Council adjudicative process, (5) an invalid Appeals Council

determination, and (6) "an unfavorable determination from this constitutionally illicit

Appeals Council adjudication process."  Doc. 8-1 at 8.  Together, these six injuries

constitute one argument; that Plaintiff has satisfied the requisite nexus because the

unfavorable decisions of the ALJ and Appeals Council were the decisions of an

unconstitutionally appointed Commissioner.[19]  Like Judge Heffley, I do not find that this

is sufficient to establish his standing.  "Instead of merely tracing her injury – the denial of

disability benefits – to Commissioner Saul's ability to delegate power to ALJs and the

Appeals Council in general, . . .  [Plaintiff's] burden is higher:  she must be able to trace

that injury to the actual unconstitutional removal clause, which is the unlawful conduct in

this matter."  Wicker, 2022 WL 267896, at *10.  Compare Collins, 141 S. Ct. at 1779

("[F]or purposes of traceability, the relevant inquiry is whether the plaintiffs' injury can

be traced to the 'allegedly unlawful conduct' of the defendant. . . .  Because the relevant

action in this case is the . . . amendment, and because the shareholders' concrete injury

---

[19]Because I construe all of Plaintiff's alleged injuries as arising from the
appointment of the Commissioner, I need not address Plaintiff's argument, see Doc. 8-1
at 9, that Defendant's failure to address injuries caused by the Appeals Council amounts
to a waiver of any defense with respect to the Appeals Council's actions.

flows directly from that amendment, the traceability requirement is satisfied."), with Wicker, 2022 WL 267896, at *10 ("Commissioner Saul did not promulgate a new action affecting or injuring Wicker . . . .   Commissioner Saul merely occupied the Commissioner role . . . .   [T]he agency continued to function as it had [before Seila Law], given that the removal clause was the only constitutional defect.").  Plaintiff has failed to establish any nexus between the removal restriction and the denial of his application for benefits.  Therefore, I reject Plaintiff's challenge to the ALJ's decision based on Seila Law.

## V.    **CONCLUSION**

The ALJ's disability determination is supported by substantial evidence.  The ALJ properly considered the opinion evidence utilizing the new criteria and did not err in her RFC determination.  Finally, Plaintiff is not entitled to remand based on his separation of powers/delegation of authority claim regarding the appointment of the Commissioner and/or the authority of the ALJ or Appeals Council to adjudicate his application for benefits.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SALVATORE SPARACIO | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, Acting | : | NO.  21-3640 |
| Commissioner of Social Security | : | |

## O R D E R

AND NOW, this 30th day of September 2022, upon consideration of Plaintiff's

brief and statement of issues (Doc. 6), Defendant's response (Doc. 7), the reply (Doc. 8-

1), and after careful consideration of the administrative record (Doc. 5), IT IS HEREBY

ORDERED that:

1.  Judgment is entered affirming the decision of the Commissioner of Social
    Security and the relief sought by Plaintiff is DENIED,

2.  The Clerk of Court is hereby directed to mark this case closed.

BY THE COURT:

/s/ Elizabeth T. Hey

_____

ELIZABETH T. HEY, U.S.M.J.